UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ANGELA TESE-MILNER as CHAPTER 7
TRUSTEE OF THE ESTATE OF W.B.
DAVID & CO., INC.,

                Plaintiff,                                  04 Civ. 5203 (KMW)

                                                        OPINION & ORDER

-against-

DIAMOND TRADING COMPANY, LTD.,

                Defendant.
-----------------------------------------------------X

Wood, U.S.D.J.:

      On April 13, 2010, Plaintiff Angela Tese-Milner ("Plaintiff"), as Chapter 7 Trustee of the

Estate of W.B. David & Co., Inc. ("W.B. David"), filed a Second Amended Complaint ("SAC")

in the above-captioned action, alleging, _inter alia_, violations of various federal and state antitrust

laws. (Dkt. No. 262.) Defendant Diamond Trading Company, Ltd. ("Diamond Trading" or

"Defendant") moves to dismiss the SAC for failure to state a claim pursuant to Federal Rule of

Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (Dkt. No. 276)

      For the reasons stated below, the Court grants Defendant's motion to dismiss.

## I.   **Factual and Procedural Background**[1]

      W.B. David was a corporation located in New York, New York. Diamond Trading is

incorporated in the United Kingdom. (SAC ¶ 6.) Diamond Trading is a member of a group of

companies affiliated with the De Beers Group ("De Beers" or "De Beers Group"). De Beers is a

---

[1] A court considering a 12(b)(6) motion must "accept[] all well-pleaded allegations in the complaint as
true, drawing all reasonable inferences in the plaintiff's favor." Operating Local 649 Annuity Trust Fund
v. Smith Barney Fund Mgmt., LLC, 595 F.3d 86, 91 (2d Cir. 2010).

group of related companies involved in the production, purchase, and sale of rough diamonds, which are diamonds that have not been cut or polished.  (SAC ¶¶ 7-10.)  From 1969 to 2003, W.B. David was a De Beers' Sightholder—a company selected by De Beers to purchase and sell De Beers' rough diamonds.  (SAC ¶ 3.)

     A.    <u>Original Complaint</u>

On July 1, 2004, W.B. David filed a 140-page Original Complaint ("OC") in this action, asserting 36 claims against over 100 defendants, including Diamond Trading.  (Dkt. No. 1.)  The OC alleged that De Beers controlled the world diamond market and was engaged in anticompetitive conduct affecting the United States markets for rough and polished diamonds. The OC's allegations focused on two categories of conduct.

First, the OC focused on the Supplier of Choice program, a program that De Beers introduced in 2003 to select its Sightholders.  The OC stated that, on June 3, 2003, Diamond Trading had informed W.B. David by letter that it did not qualify as a Sightholder under Supplier of Choice, and that it would lose its Sightholder status after a transitional six-month period (<u>i.e.,</u> after December 2003).  The OC alleged that De Beers terminated W.B. David as a Sightholder after De Beers used the Supplier of Choice program to reduce the number of Sightholders, thereby restricting the supply of diamonds to the market and raising diamond prices.  Second, the OC stated that De Beers had stolen from W.B. David a proprietary diamond marketing campaign titled "Leading Jewelers of the World" ("LJW").  The OC alleged that these two categories of conduct by De Beers—the Supplier of Choice Program and the LJW campaign—violated: (1) federal and state antitrust laws, including Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; (2) Racketeering Influenced and Corrupt Organizations Act; and (3) state common law.

On January 25, 2006, unsecured creditors filed an involuntary Chapter 7 bankruptcy petition against W.B. David in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Bankruptcy Court entered an order of relief on February 8, 2006, and appointed Angela Tese-Miner (Plaintiff) as Trustee of the W.B. David Estate.  (SAC ¶¶ 4-5.)

    B.    <u>Amended Complaint</u>

On July 11, 2007, Plaintiff filed an 11-page Amended Complaint ("AC"), omitting all but seven of the original defendants.  (Dkt. No. 151.)  In the AC, Plaintiff brought claims against Diamond Trading and six other companies allegedly related to De Beers.  Plaintiff abandoned all of the OC's specific allegations regarding the Supplier of Choice program and the LJW campaign.  Instead, the AC alleged that De Beers is involved in "an amorphous, world-wide conspiracy with unnamed co-conspirators to control the global diamond market."  <u>See</u> <u>Tese-Milner v. Diamond Trading Co.</u>, No. 04 cv. 05203, at 27 (S.D.N.Y. Feb. 24, 2010).  The AC alleged that De Beers' monopolistic conduct has anticompetitive effects in the diamond market and violates Sections 1 and 2 of the Sherman Act and Section 340 of the Donnelly Act.  (<u>Id.</u>)

In September 2007, certain defendants filed a motion to dismiss the AC for failure to state a claim, pursuant to Rule 12(b)(6).  Other defendants (the "Jurisdictional Defendants") moved to dismiss the AC for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), and for insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5).  (Dkt. Nos. 154 & 162.)

On January 23, 2009, this Court issued an order addressing the Jurisdictional Defendants' motion to dismiss.  <u>See</u> <u>Tese-Milner v. De Beers Centenary A.G., et al. ("Tese-Milner I")</u>, 613 F.

Supp. 2d 404 (S.D.N.Y. 2009).  The Court found, inter alia, that Plaintiff had made a sufficient

start toward a showing of jurisdiction, and allowed jurisdictional discovery.

On August 31, 2009, after the completion of jurisdictional discovery, Plaintiff moved for

leave to file a Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a).

(Dkt. No. 235.)  Defendants opposed that motion and cross-moved to dismiss the AC pursuant to

Rule 12(b)(6).  The Jurisdictional Defendants also renewed their motion to dismiss.  (Dkt. Nos.

238 & 240.)

On February 24, 2010, the Court issued an opinion and order, inter alia, (1) granting the

Jurisdictional Defendants' motion to dismiss the AC; (2) denying Plaintiff's motion for leave to

amend; and (3) granting defendants' motion to dismiss the AC pursuant to Rule 12(b)(6).  See

Tese-Milner v. Diamond Trading Co. (Tese-Milner II), No. 04 cv. 05203 (S.D.N.Y. Feb. 24,

2010);  see also Dkt. Nos. 259 & 267.[2]  The Court held that, because the AC omitted "almost all

of the OC's factual allegations," and instead introduced a new set of operative facts, the AC did

not relate back to the OC for statute of limitations purposes.  Tese-Milner II at 27.  The Court

noted that there was "not a single reference in the AC to the Supplier [of] Choice Program or De

Beers' U.S. marketing, advertising, or retail claims."  Id.  The Court thus found that the AC's

claims were limited to conduct that occurred on or after February 8, 2002—which is four years

prior to the filing of the AC and an additional two years from the order of relief in the

bankruptcy proceeding, which was entered on February 8, 2006.[3]  The Court also found that the

_____

[2] The original Opinion and Order was filed under seal on March 1, 2010.  (Dkt. No. 259.)  A redacted
version of the Opinion and Order was filed publicly on May 14, 2010.  (Dkt. No. 267.)

[3] The statute of limitations for Sherman Act claims is four years, accruing when the defendant commits an
act that injures the plaintiff.  15 U.S.C. § 15b.  When a plaintiff files for bankruptcy, the statute of

Plaintiff had failed to: (1) identify specific conduct by Diamond Trading that violated antitrust laws; (2) allege an agreement between Diamond Trading and a non-De Beers Group organization; and (3) allege a relevant market in which the conduct had occurred.  Finally, the Court held that Plaintiff could replead her claims against Diamond Trading.  See Tese-Milner II at 36 ("If Plaintiff can make out more specific, factual allegations about the role of Diamond Trading in De Beers' alleged monopoly, however, then Plaintiff may be able to state a claim against the company.").

     C.    Second Amended Complaint

     On April 13, 2010, Plaintiff filed the instant SAC, asserting the following: (1) combination and conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3) attempt to monopolize in violation of Section 2 of the Sherman Act; (4) conspiracy to monopolize under Section 2 of the Sherman Act; (5) combination and conspiracy to restrain trade in violation of the Wilson Tariff Act, 15 U.S.C. § 8 et. seq. (the "Wilson Act"); and (6) combination and conspiracy to monopolize and restrain trade in violation of the Donnelly Antitrust Act, N.Y. Gen. Bus. Law § 340 (the "Donnelly Act").  (SAC ¶¶ 123-161.)

     The SAC challenges four categories of alleged conduct by Defendant.  First, Plaintiff asserts that Defendant horizontally restrained the supply in the U.S. rough diamond market, in violation of Section 1 of the Sherman Act, when members of the De Beers Group entered into agreements with ALROSA, a Russian diamond mining company and a competitor of the De Beers Group.  (SAC ¶¶ 35-47.)  Second, Plaintiff asserts that Defendant vertically restrained

---

limitations is tolled for two years from the date that the bankruptcy court files the order for relief.  11 U.S.C. § 108(a).

trade, in violation of Section 1 of the Sherman Act, by entering into curtailment agreements with De Beers Consolidated Mines, Ltd. ("DBCM"), a member of the De Beers Group, and by entering into sales agreements with the Government of Botswana.  (SAC ¶¶ 48-62.)  Third, Plaintiff challenges various elements of Defendant's advertising and marketing campaigns, including its U.S. Carat Club, and its De Beers Limited Edition of Millennium Diamonds Campaign ("Millennium Campaign"), as violations of Section 2 of the Sherman Act.  (SAC ¶¶ 68-94.)  Finally, Plaintiff resurrects her claims related to Defendant's Supplier of Choice program that were included in the OC, but not in the AC.  Plaintiff alleges that the program violated Section 2 of the Sherman Act.  (SAC ¶¶ 95-122.)

On May 7, 2010, Defendant moved to dismiss the SAC pursuant to Rule 12(b)(6).  (Dkt. No. 264.)  Defendant asserts that the SAC fails to allege any specific, actionable conduct by Defendant.  Defendant also asserts that the conduct alleged by Plaintiff as unlawful falls outside of the applicable limitations period.  Specifically, Defendant contends that Plaintiff must allege wrongful conduct by Defendant that took place between February 8, 2002, the limitations period identified in the Court's February 24, 2010 opinion dismissing the AC, and December 2003, when W.B. David ceased to be a Sightholder.  With respect to that latter date, Defendant contends that Plaintiff may assert only those claims that are based on purchases that it made as a Sightholder, because Plaintiff's non-Sightholder claims (all claims arising after 2003, when Plaintiff's Sightholder status was terminated) are covered by a class action settlement release in a related case, Sullivan v. DB Inv., No. 04 cv. 2819 (D.N.J. June 14, 2004) (the "Sullivan release").

The Sullivan release covers two settlement classes:  the Direct Purchaser Class and the Indirect Purchaser Class.  The Direct Purchaser Class includes all persons who purchased a

rough or polished diamond directly from a defendant, including any affiliate of a defendant, or a

defendant's competitor.  The Indirect Purchaser Class includes persons who purchased a rough

or polished diamond from someone other than a defendant, an affiliate of a defendant, or a

defendant's competitors.[4]  Plaintiff admits to being a member of both settlement classes.  See

Letter for John A. Wait, August 12, 2010.

     The Release contains an exception for direct purchaser claims of Sightholders.  See Am.

Settlement Agreement § V(A) ("Nothing in the Settlement is intended to release any direct

purchaser claim of any Sightholder.").  A "sightholder" is defined as "a customer . . . entitled to

purchase Rough Diamonds from [De Beers Defendants] as a regularly scheduled Sight or

Sights," and, "Sightholder status terminates when [this right] . . . terminates."  Id. at §I(PP).

     The parties agree that, should the Sullivan settlement remain in effect,[5] the Sullivan

release covers all of Plaintiff's claims against Defendant except any claims arising out of W.B.

_____

[4] The Sullivan release provides that:

> Upon the Effective Date, the Released Parties shall be released and forever discharged from any
> and all claims, causes of action, demands, rights, actions, suits and requests for equitable, legal
> and administrative relief of any kind or nature whatsoever . . . that any member of the Settlement
> Classes who has not timely excluded himself, herself or itself from the action, ever had, could
> have had, now has, or can, shall or may have in the future . . . concerning the exploration, mining,
> processing, treatment, sorting, distribution, marketing, advertising, sale or pricing of any
> Diamond Product, including but not limited to . . (iii) methods of distribution or distribution
> programs of any Diamond Product (including but not limited to the Supplier of Choice program)
> including all means of selling or distributing any Diamond Product. . . ."

Am. Settlement Agreement § V(A).

[5] On July 13, 2010, a three-judge panel from the Third Circuit Court of Appeals vacated the settlement
approval on grounds relating to class certification.  Sullivan v. DB Inv., 613 F.3d 134 (3d Cir. 2010).  On
August 27, 2010, the Third Circuit granted a petition by the class-action plaintiffs for a rehearing en banc,
and vacated the Third Circuit's July 13, 2010 opinion.  Sullivan v. DB Inv., 619 F.3d 287 (3d Cir. 2010).
Oral argument was held on February 23, 2011, but the en banc court has not yet issued a decision.

David's purchases as a Sightholder.  See John A. Wait Letter, Aug. 12, 2010; see also Tese-Milner I, 613 F. Supp. 2d at 409 ("The parties agree that the settlement limits Plaintiff's claims in the instant case to those based on W.B. David's purchases as a Sightholder . . . .").

On September 14, 2010, the Court issued an order denying Defendant's motion to dismiss the SAC without prejudice, on the basis that the parties had insufficiently briefed several issues.  (Dkt. No. 275.)  The Court granted Defendant leave to refile its motion and ordered that the parties submit supplemental briefing on the following three issues:  (1) whether any specific factual allegations in the SAC relate back to the OC; (2) whether Plaintiff's Supplier of Choice claims are covered by the Sullivan release; and (3) whether Plaintiff's Supplier of Choice claims are barred by the statute of limitations or, alternatively, whether they relate back to the OC, notwithstanding the fact that they were dropped from the AC.  (Id.)

On October 22, 2010, Defendant refiled its motion to dismiss. The parties have filed supplemental briefs responding to the Court's September 14, 2010 order.   (Dkt. No. 276.)

## II.    **Legal Standard: Motion to Dismiss**

In order to survive a Rule 12(b)(6) motion, a plaintiff must have pleaded sufficient factual allegations "to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, -- U.S. --, 129 S. Ct. 1937, 1949 (2009).  Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  Twombly, 550 U.S. at 570.  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor."  Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations

8

omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Iqbal, 129 S. Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

There is no heightened pleading requirement in antitrust cases.  See Twombly v. Bell Atl. Corp., 425 F.3d 99, 108-09 (2d Cir. 2005), rev'd on other grounds, 550 U.S. 544 (2007) ("We have consistently rejected the argument . . . that antitrust complaints merit a more rigorous pleading standard.").

## III.    Legal Standard: Sherman Act Claims

Plaintiff brings claims under Sections 1 and 2 of the Sherman Act.

A.    Section 1 of the Sherman Act

Section 1 of the Sherman Act makes it illegal to enter into a "contract, combination . . . or conspiracy" to restrain trade or commerce.  15 U.S.C. § 1.  To properly plead a violation of Section 1, a plaintiff must allege that (1) defendants were involved in a contract, combination or conspiracy that (2) operated unreasonably to restrain interstate trade.  In re Elevator Antitrust Litig., No. 04 cv. 1178, 2006 WL 1470994, at *7 (S.D.N.Y. May 30, 2006) (Greisa, J.).  The bare assertion of a conspiracy is not enough to survive a Rule 12(b)(6) motion to dismiss; the complaint must contain "enough factual matter (taken as true) to suggest that an agreement [to restrain trade] was made."  Twombly, 550 U.S. at 556.  A well-pleaded complaint should include specific, factual allegations as to "the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts . . . they performed . . . ."  Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001) (Marrero, J.).  "[U]nspecified contracts with unnamed other entities to achieve unidentified

anticompetitive effects does not meet the minimum standards of pleading a conspiracy in violation of the Sherman Act." Garshman v. Universal Res. Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987).

Section 1 does not cover wholly unilateral action. See Gordon v. Lewiston Hosp., 423 F.3d 184, 207 (3d Cir. 2005) ("Unilateral action simply does not support liability; there must be a unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement.") (internal quotations and citations omitted). To state a claim pursuant to the section a plaintiff must allege concerted action by two or more "legally distinct economic entities." Primetime 24 Joint Venture v. Nat'l Broad. Co., 219 F.3d 92, 103 (2d Cir. 2000).

B.    Section 2 of the Sherman Act

Section 2 of the Sherman Act makes it illegal for an individual to monopolize a market. 15 U.S.C. § 2. To state a claim of monopolization pursuant to Section 2, a plaintiff must allege that the defendant (1) possesses monopoly power in a relevant market; (2) willfully acquired or maintained that power; and (3) engaged in anti-competitive behavior. Invamed, Inc. v. Barr Labs., Inc., 22 F. Supp. 2d 210, 218 (S.D.N.Y. 1998) (Sweet, J.).

A relevant market is comprised of the product market and geographic market in which the defendant allegedly exercises monopoly power. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). A product market includes all products that are reasonably interchangeable, which requires consideration of the cross-elasticity of demand (that is, the extent to which a change in the price of one product will alter the demand for another product). Id. at 436. A geographic market is the geographic area in which competition occurs. Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227-31 (2d Cir. 2006). The allegation of a relevant market is a "prerequisite" to a Section 2 claim. Polargrid LLC v. Videsh Sanchar

10

Nigam, Ltd., No. 04 cv. 9578, 2006 WL 2266351, at *6 (S.D.N.Y. Aug. 7, 2006) (Greisa, J.).

Determining a relevant market can be a fact-intensive inquiry, and thus courts often hesitate to

dismiss a claim for failing to adequately plead a relevant market.  Todd v. Exxon Corp., 275 F.3d

191, 199-200 (2d Cir. 2001).  "There is, however, no absolute rule against [ ] dismissal" on such

a ground.  Id. at 200.

Section 2 also prohibits conspiracies between two or more persons to monopolize.  To

plead that a defendant was involved in a conspiracy to monopolize, a plaintiff must sufficiently

allege (1) that the defendant entered into concerted action with the specific intent of achieving a

monopoly, and (2) the commission of overt acts in furtherance of the conspiracy.  See Int'l

Distib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 795-96 (2d Cir. 1987); Invamed, Inc., 22

F. Supp. 2d at 220.  To survive a motion to dismiss, an antitrust plaintiff must allege facts "that

reasonably tend[ ] to prove that the [defendant] . . . 'had a conscious commitment to a common

scheme designed to achieve an unlawful objective.'"  Monsanto Co. v. Spray-Rite Serv. Corp.,

465 U.S. 752, 764 (1984) (citations omitted).

## IV.   **Analysis**

For the reasons that follow, the Court grants Defendant's motion to dismiss.

### A.     Claims Related to the Supplier of Choice Program

Plaintiff brings claims arising out of Defendant's Supplier of Choice program, through

which W.B. David was terminated as a Sightholder.  (SAC ¶¶ 95-122.)  Plaintiff alleges that the

program violated Section 2 of the Sherman Act because its purpose "was to increase market

demand for diamonds in general and to increase market demand for De Beers' diamonds in

particular."  (Id. ¶ 96.)

The Court dismisses Plaintiff's claims that relate to the Supplier of Choice program, because those claims have been abandoned and fall outside the applicable statute of limitations for actions under the Sherman Act.

        1.      <u>Legal Standard: Statute of Limitations for Sherman Act Claims</u>

The statute of limitations for Sherman Act claims (as well as Donnelly Act and Wilson Act claims) is four years, accruing when the defendant commits an act that injures the plaintiff. 15 U.S.C. § 15b; <u>see also</u> N.Y. Gen. Bus. Law § 340(5).  In the case of a continuing antitrust conspiracy, the statute of limitations restarts at the time of each overt act that is part of the violation and that injures the plaintiff.  <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 189 (1997). Although for some antitrust cases, a continuing course of conduct can give rise to continually accruing causes of action, there is no continuing violation when the initial refusal to deal is final. <u>David Orgell, Inc. v. Geary's Stores, Inc.</u>, 640 F.2d 936, 938 (9th Cir. 1981) (statute of limitations starts to run at the initial refusal to sell); <u>see also</u> Phillip E. Areeda and Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 320c3 (3d. ed. 2007) ("More than almost any other plaintiff, the victim of a direct refusal to deal knows immediately that it has occurred. . . .").

An amended complaint relates back to the filing of the original complaint for statute of limitations purposes where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(b).  To determine whether relation back is appropriate, courts consider whether the original complaint gave the defendant adequate notice of the matters raised in the amended pleading.  <u>Schiavone v. Fortune</u>, 477 U.S. 21, 31 (1986).  An amended complaint relates back if it renders previous allegations more definite and precise, but not if it introduces a new set of operative facts.  <u>Slayton v. Am. Express Co.</u>, 460 F.3d 215, 228 (2d Cir. 2006).  Even

where an amended complaint tracks the legal theory of the original complaint, claims based on an entirely distinct set of factual allegations do not relate back for purposes of Rule 15.  Bank of Brussels Lambert v. Chase Manhattan Bank, No. 93 Civ. 5298, 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999) (McKenna, J.) (stating that there is no relation back if the amendment sets forth a "separate set of operative facts").

When an amended pleading relates back to an earlier pleading, it will be deemed to have been filed on the date of the earlier pleading.  When an amended pleading does not relate back to an original pleading, it will be deemed to be filed on its actual filing date.  In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ. 9203, 2010 WL 1372709, at *9-10 (S.D.N.Y. Mar. 31, 2010) (Sullivan, J.).

2.    Analysis

The Court finds that Plaintiff, having abandoned her Supplier of Choice program claims in her AC, is not permitted to resurrect those claims by filing her SAC.

The OC, filed on July 1, 2004, asserted claims under the Sherman Act based on an alleged plot by the De Beers Group to increase its control over the U.S. diamond market through the Supplier of Choice program, resulting in W.B. David's termination as a Sightholder.

Over three years later, on July 11, 2007, Plaintiff filed her AC, in which she omitted the factual allegations involving the Supplier of Choice program, and instead asserted claims based an alleged broad-based conspiracy to control the diamond industry.  Because there was not a single reference to the Supplier of Choice Program in the AC, the Court, in its opinion dismissing the AC, found that the AC introduced a new set of operative facts, and therefore, did not relate back to the OC.  See Tese-Milner II at 27-28.  The Court permitted Plaintiff to replead only the claims against Defendant Diamond Trading, in order to allege with greater particularity

13

her conspiracy claim against Diamond Trading.  See id. (identifying Plaintiff's fundamental

flaws in her AC, including her failure to (1) identify specific conduct by Diamond Trading that

violated antitrust law; (2) allege an agreement between Diamond Trading and a non-De Beers

Group Entity; and (3) allege a relevant market).

Another three years later, on April 13, 2010, Plaintiff filed her SAC.  In the SAC,

Plaintiff did not allege with greater particularity the broad-based conspiracy claims that she had

alleged in her AC.  Rather, she resurrected her Supplier of Choice claims, claims that she had

abandoned three years earlier, and claims with which Defendant had not been presented for

nearly six years.

There is nothing in the Federal Rules of Civil Procedure that allows a plaintiff to

resurrect once-abandoned claims by (1) filing another complaint; (2) including those abandoned

claims in that new complaint; and (3) contending that the new complaint relates back to the

original complaint.  Plaintiff nevertheless asks the Court to find that she did not abandon her

Supplier of Choice claims, because those claims contained in the SAC relate back to the OC,

notwithstanding the fact that those claims were dropped entirely from the AC.[6]  Here, Plaintiff

alleged a set of facts in her original complaint, did not include those facts in an amended

---

[6] Plaintiff does not dispute that, absent relation back, her Supplier of Choice claims are barred by the statute of limitations.  In the SAC, Plaintiff states that, on or about July 12, 2000, the De Beers group launched the Supplier of Choice program, which altered the way in which its Sightholders were selected. (SAC ¶ 95.)  On June 3, 2003, W.B. David was notified that it failed to qualify as a Sightholder under the Supplier of Choice program.  (Id. ¶ 109).  After a six-month transition period (i.e., after December 2003), W.B. David ceased being a Sightholder, and was no longer able to able to purchase rough diamonds from Defendant.  (Id.)  At that point, W.B. David's termination was final; Plaintiff does not allege any attempt by W.B. David to regain its Sightholder status.  Thus, based on a straightforward application of the statute of limitations, Plaintiff should have brought claims related to the Supplier of Choice program within four years after W.B. David learned that it would no longer be a Sightholder, i.e., by June 2007, and certainly no later than four years after its actual termination as a Sightholder, i.e., by December 2007.  The SAC was not filed until April 2010.

complaint filed three years later, and then, almost another three years later, attempted to resurrect the original set of facts in her second amended complaint.  Plaintiff is thus asking the Court to find that the Supplier of Choice claims in the third complaint relate back to the first complaint, even though they were omitted from the second complaint.

The Court rejects this argument.  Relation-back cannot be used as a mechanism to revive abandoned claims.[7]  Cf. Vogel v. Am. Kiosk Mgmt., 371 F. Supp. 2d 122, 129-30 (D. Conn. 2005) ("In many instances the procedure for, and effect of, an amendment will be the same as a voluntary dismissal under 41(a)(1) because of the similarities between the governing rules.");[8] Hollenberg v. AT&T Corp., No. 95 Civ. 9515, 2001 WL 1518271, at *2 (S.D.N.Y. Nov. 28, 2001) (McKenna, J.) ("[D]iscontinuance does not toll the statute of limitations.") (citations omitted).

Plaintiff asserts that she never expressly withdrew any claims, but rather, amended her pleadings.  Plaintiff characterizes her amendments as changes "in legal theory."  (Pl. Supp. Br. at 2, 5 n.1.)  In the AC, however, Plaintiff did not simply change her legal theory.  Rather, she pleaded an entirely different set of operative facts to support her claim for antitrust injury.  The OC's allegations concerning the Supplier of Choice program focused on the harm suffered by

---

[7] If the Court were to take Plaintiff's argument to its extreme conclusion, a plaintiff would be permitted, for example, to file a complaint alleging a breach of contract claim based on one set of facts, file dozens of amended complaints alleging breach of contact claims based on entirely different sets of facts, and then, twenty-years later, file a complaint alleging a breach of contact claim based on the original set of facts, asserting that the newest complaint relates back to the original complaint, simply because the original complaint contained those same facts. That result is clearly not envisaged by the Federal Rules of Civil Procedure.

[8] Vogel is distinguishable from the instant facts, because, in Vogel, the plaintiff expressed intent to withdraw certain claims in an opposition to a motion to dismiss, rather than amend her complaint. Nevertheless, the Vogel decision makes clear that when a plaintiff makes an affirmative decision to no longer pursue certain claims, that decision is akin to a voluntary dismissal of those claims.

W.B. David as a result of it being deprived of its Sightholder status.  The OC sought damages for a period of time <u>following</u> W.B. David's termination as a Sightholder in 2003.  The AC, in contrast, focused on an alleged conspiracy between the De Beers Group and unidentified coconspirators.  The AC sought damages from a period of time <u>prior to 2003</u>, during which W.B. David was a Sightholder and was allegedly being forced to overpay for diamonds.

The Federal Rules of Civil Procedure allow for the relation back of claims only when the court is confident that the defendant <u>has notice of those claims</u>.  <u>See</u> <u>Bridgeway Corp. v. Citibank, N.A.</u>, 132 F. Supp. 2d 297, 301 (S.D.N.Y. 2001) (Chin, J.) ("Under Rule 15(c), the essential inquiry in determining whether the new allegations relate back is whether the defendant was given adequate notice that such claims might be made upon examining the facts alleged in the original pleading.") (quotations and citations omitted).  Plaintiff contends that the OC put Defendant on notice of her Supplier of Choice claims.  Plaintiff is correct that the Defendant was on notice of the Supplier of Choice claims while the OC was pending.  However, by not including the Supplier of Choice claims in her AC, Defendant was no longer on notice of those claims.  When Plaintiff chose not to include her Supplier of Choice claims in her AC, it was reasonable for Defendant to believe that Plaintiff no longer wished to pursue a cause of action for antitrust injury based on the operative facts surrounding the Supplier of Choice program.  As a result, for nearly three years between the filing of the AC and the filing of the SAC, Defendant was likely preparing to defend against claims arising out of a different set of operative facts. (<u>See</u> Def. Supp. Reply Mem. at 10.)  The intervening complaint—the AC—essentially resulted in there being a lack of notice to Defendant with respect to Plaintiff's Supplier of Choice claims.

Accordingly, it would be <u>highly</u> prejudicial to allow Plaintiff to relate back those claims that she abandoned nearly three years earlier.[9]

In sum, Plaintiff could have pled in the alternative, or kept her Supplier of Choice claims alive in some other manner in her AC, but she did not do so. Rather, she abandoned those claims, letting them lie dormant until the statute of limitations had run. For these reasons, the Court finds that Plaintiff's claims arising out of the Supplier of Choice Program have been abandoned, and cannot relate back to the OC.

3.    <u>The Supplier of Choice Claims and the Sullivan Release</u>

In addition to dismissing Plaintiff's Supplier of Choice claims on the basis that they have been abandoned and fall outside the applicable statute of limitations period, the Court may not consider Plaintiff's Supplier of Choice claims because they are barred by the <u>Sullivan</u> release, should the settlement remain in effect.[10]   The <u>Sullivan</u> release states that the "Released Parties shall be released and forever discharged from any and all claims . . . concerning . . . (iii) methods of distribution or distribution programs of any Diamond Product (<u>including but not limited to the Supplier of Choice program</u>) including all means of selling or distributing any Diamond Product. . . ."   Am. Settlement Agreement § V(A) (emphasis added). Notwithstanding

---

[9] It is true that courts have found that a second amended complaint can relate back to an original complaint. <u>See</u> <u>Prescott v. Annetts</u>, No. 09 Civ. 4435, 2010 WL 3020023, at *6 (S.D.N.Y. July 22, 2010) (McMahon, J.) (finding that the Section 1983 claims in plaintiff's first and second amended complaints are not time-barred because they relate back to the original complaint); <u>DeLong v. Soufiane</u>, No. 05 cv. 5529, 2010 WL 234781, at *3 (E.D.N.Y. Jan. 14, 2010) ("[T]he Court finds that all but two causes of action alleged in the Second Amended Complaint are timely because they relate back to the filing of the original Complaint."). However, in those decisions, there was <u>no</u> suggestion that the plaintiff had abandoned any set of claims in an intervening complaint, or that the plaintiff's original complaint contained a different operative set of facts than the subsequent amended complaints.

[10] <u>See supra</u> note 4.

the Release's explicit reference to "distribution programs of any Diamond Product (including but not limited to the Supplier of Choice program)," Plaintiff contends that her Supplier of Choice claims fall within the exception to the Release for direct purchaser claims of Sightholders.  See id. § V(A) ("Nothing in the Settlement is intended to release any direct purchaser claim of any Sightholder.").[11]

Plaintiff's own characterization of her Supplier of Choice claims makes clear that her claims do not fall within the exception for "any direct purchaser claims of any Sightholder." According to Plaintiff, the Supplier of Choice program "resulted in closing most of the U.S. Rough Diamond Market to plaintiff."  (SAC ¶ 120.)  Plaintiff's Supplier of Choice claims are thus not based on any injury that W.B. David suffered as a result of purchasing diamonds from Defendant as a Sightholder; rather, they are based on the injury W.B. David suffered as a result of no longer being able to make direct purchases from Defendant.  Through her Supplier of Choice claims, therefore, Plaintiff is alleging antitrust injury based on the fact that she is no longer a Sightholder.  Because those claims do not arise out of direct purchases made as a Sightholder, they are precluded by the Sullivan release.

4.   Conclusion

The Court dismisses Plaintiff's Supplier of Choice claims, finding that they have been abandoned, fall outside the applicable limitations period, and are barred by the Sullivan release.[12]

---

[11] As noted above, the parties agree that the Sullivan release covers all of Plaintiff's claims against Defendant except any claims arising out of W.B. David's status as a Sightholder.  See Tese-Milner I, 613 F. Supp. 2d at 409.

[12] Defendant also argues that Plaintiff's Supplier of Choice claims must be dismissed because Plaintiff has (1) failed to allege monopoly power in a relevant market; and (2) failed to allege the willful acquisition or maintenance of monopoly power, both of which are prerequisites for a Section 2 Sherman Act claim.  The

B.    Claims Related to Defendant's Advertising and Marketing

Plaintiff challenges Defendant's advertising and marketing activity in the United States, including Defendant's U.S. Carat Club and Defendant's Millennium Diamonds Campaign (hereinafter, collectively "advertising and marketing" claims or activity),[13] as violations of Section 2 of the Sherman Act.  (SAC ¶¶ 68-94.)  The Court dismisses those claims because they fall outside the applicable limitations period.

The parties dispute whether Plaintiff's advertising and marketing claims relate back to the OC.[14]  Plaintiff asserts that relation back is permissible because the OC contained allegations regarding Defendant's advertising and marketing activity and Defendant therefore had adequate notice of those claims.  Plaintiff cites several paragraphs throughout the OC referencing those activities.[15]  Defendant contends that there was nothing in the OC to suggest that W.B. David was challenging Defendant's advertising and marketing activity as a basis for an antitrust claim because the paragraphs cited by Plaintiff do not challenge that conduct, but rather, tout W.B. David's involvement in those advertising and marketing activities.

---

Court need not address those agreements because it has dismissed Plaintiff's Supplier of Choice claims under Section 2 of the Sherman Act for other reasons.

[13] The De Beers Group used the U.S. Carat Club as a way to meet with U.S. Sightholders, as well as other large U.S. manufacturers and retailers.   (SAC ¶ 69.)  The De Beers Group launched the Millennium Campaign to sell limited edition diamonds inscribed with the De Beers name.  (SAC ¶ 80.)

[14] Plaintiff appears to acknowledge that her advertising and marketing claims must relate back to an earlier complaint in order for them to be timely. Plaintiff filed her SAC on April 13, 2010.  Four years prior to that date, Plaintiff was admittedly no longer a Sightholder, and so any claims accruing after that date would be barred by the Sullivan Release.  Any claims accruing before that date would have had to have been brought earlier than April 13, 2010.

[15] See OC ¶¶ 165-70, 189, 318, & 331.

Even assuming that the SAC's allegations regarding Defendant's advertising and marketing activity arise from the same operative facts as allegations contained in the OC, Plaintiff's advertising and marketing claims do not relate back to the OC for the same reasons that Plaintiff's Supplier of Choice claims do not relate back to the OC: they were abandoned in the AC.

The AC contains <u>no</u> reference to any facts surrounding Defendant's marketing and advertising activities. Nor can allegations about an amorphous, world-wide conspiracy with unidentified entities be read to encompass Plaintiff's advertising and marketing claims. By not including these advertising and marketing claims in her AC, Plaintiff conveyed to Defendant that she had abandoned those claims and made an affirmative litigation decision to no longer pursue a cause of action for antitrust injury based on those operative facts. The intervening complaint (the AC) deprived Defendant of notice with respect to Plaintiff's advertising and marketing claims. The Court thus finds that these claims do not relate back to the OC, and dismisses them as falling outside the statute of limitations period.[16],[17]

C.   Claims Related to Agreements between Defendant and Others

Plaintiff asserts that Defendant horizontally restrained supply in the U.S. Rough Diamond Market, in violation of Section 1 of the Sherman Act, by entering into agreements with

---

[16] Plaintiff does not cite specific dates with respect to her advertising and marketing claims. (<u>See</u> SAC ¶¶ 68-79; 92-94.) In the event that the <u>Sullivan</u> settlement is vacated, Plaintiff is granted leave to replead any claims surrounding Defendant's advertising and marketing activity that are timely as measured from the SAC (accounting for the fact that the Court has found that Plaintiff's advertising and marketing claims in the SAC do not relate back to the OC).

[17] Defendant also argues that Plaintiff's advertising and marketing claims must be dismissed because Plaintiff has (1) failed to allege monopoly power in a relevant market and (2) failed to allege the willful acquisition or maintenance of monopoly power, both of which are prerequisites for a Section 2 Sherman Act claim. The Court need not address those arguments because it has dismissed Plaintiff's advertising and marketing claims under Section 2 of the Sherman Act for other reasons.

ALROSA, a Russian diamond mining company and a competitor of the De Beers Group.  (SAC

¶¶ 35-47.)  Plaintiff also asserts that Defendant vertically restrained trade, in violation of Section

1 of the Sherman Act, by (1) entering into curtailment agreements with DCBM, a member of the

De Beers Group; and (2) entering into sales agreements with the Government of Botswana.

(SAC ¶¶ 48-62.)  For the reasons that follow, these claims are dismissed.

1. DBCM

Plaintiff's claims regarding a conspiracy between Defendant and DBCM—or any other

member of the De Beers Group—fail as a matter of law.  As the Court has held earlier, "[i]n

order to state a claim pursuant to Section 1 [of the Sherman Act], the SAC must name [at] least

one, specific, non-De Beers entity that is allegedly acting in concert with Diamond Trading . . . .

The SAC's failure to do so means that it would not survive a Rule 12(b)(6) motion to dismiss."

Tese-Milner II at 32.  See also Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752,

777 (1984) (holding that a parent company and subsidiary are incapable of conspiring for

purposes of Section 1 Sherman Act claims); Gucci v. Gucci Shops, Inc., 651 F. Supp. 194, 196

(S.D.N.Y. 1986) (Conner, J.) (applying Copperweld to sister corporations); N. Atl. Utils., Inc. v.

Keyspan Corp., 307 A.D. 2d 342, 343 (App. Div. 2003) (applying Copperweld to Donnelly Act

claims).   Accordingly, Plaintiff's claims involving an alleged conspiracy between Defendant and

one or more members of the De Beers Group are dismissed.

2. ALROSA

In the SAC, Plaintiff alleges that a 2001 supply agreement between De Beers Centenary

A.G. ("DBCAG") and ALROSA constitutes a horizontal restraint of trade in violation of Section

1 of the Sherman Act.  (SAC ¶ 38.)  Plaintiff asserts that "Diamond Trading and other members

of the De Beers Group conspired with DBCAG and ALROSA to fix prices and control the

supply of rough diamonds in the U.S. Rough Diamond Market through the Alrosa agreement." (SAC ¶ 40.)

Although the ALROSA agreement was mentioned in the OC,[18] the AC did not contain a single reference to ALROSA or to any sales agreement with ALROSA.  If it had, the Court, in its February 24, 2010 opinion, might have found that certain parts of the AC related back to the OC.  However, like Plaintiff's Supplier of Choice claims and her advertising and marketing claims, the Court finds that the ALROSA claims were abandoned in the AC.  The Defendant did not have notice of those claims in the three years between the AC and the SAC, and so relation back is not permissible.

Moreover, even assuming, arguendo, that the ALROSA claims were not abandoned in the AC, the SAC fails to identify Defendant as a party to the 2001 agreement with ALROSA.  See SAC ¶ 38 (describing the December 17 2001 agreement as "entered into by DBCAG [De Beers Centenary AG] and Alrosa").  Rather, the SAC contains the broad assertion that, through the 2001 agreement between ALROSA and DBCAG, "Diamond Trading and other members of the De Beers Group conspired with DBCAG and Alrosa to control the supply of rough diamonds." (SAC ¶ 40.)  Finally, the SAC suggests that the ALROSA agreement never went into effect, stating that it "was reviewed and ultimately rejected by the European Commission as anticompetitive."  (SAC ¶¶ 38; 47; see also Def. Mem. at 9 n.5.)

> 3.     Botswana

---

[18] See OC ¶¶ 232-35 (Section titled "De Beers Agreement with ALROSA—De Beers Increases its Rough Diamond Market Control").

In the SAC, Plaintiff challenges sales agreements, dated 2001 and 2005, between various members of the De Beers Group and the Government of Botswana.  Plaintiff states that, pursuant to those agreements, "the government of Botswana agreed to sell to De Beers all diamonds mined in Botswana by [] Debswana, the joint venture between the government of Botswana and [] Deliebs, a company registered in the British Virgin Island and owned by DBSA [De Beers S.A.]."  (SAC ¶ 55.)

The 2005 agreement with Botswana post-dates W.B. David's time as a Sightholder. Accordingly, claims relating to that agreement are barred by the Sullivan Release.  See Tese-Milner I, 613 F. Supp. 2d at 409 ("The parties agree that the settlement limits Plaintiff's claims in the instant case to those based on W.B. David's purchases as a Sightholder . . . .").[19]

With respect to the 2001 agreement, neither the OC nor the AC contains any mention of the Government of Botswana or Debswana.  Plaintiff does not dispute this fact, but rather, asserts that the allegations regarding Botswana that are found in the SAC "arise out of the same type of conduct, the formation of sales agreements to maintain Defendant's dominance in the rough diamond market, as that which was alleged in the Original Complaint."  (Pl. Supp. Br. at 6 n.2.) Although Plaintiff is seemingly alluding to the OC's reference to the ALROSA agreement, that reference would not have put Defendant on notice of an alleged conspiracy with an entirely different entity that was not mentioned in the OC or in the AC.  For these reasons, the SAC's allegations concerning a 2001 agreement with the Government of Botswana do not relate back to the OC.

---

[19] In the event that the Sullivan settlement is vacated, Plaintiff is granted leave to replead any claims surrounding Defendant's 2005 agreement with the Government of Botswana.

4.      Conclusion

For the foregoing reasons, Plaintiff's claims regarding agreements between Defendant and DBCM, Defendant and ALROSA, and Defendant and the Government of Botswana are dismissed.[20]

D.      Plaintiff's Remaining Claims

Plaintiff also brings claims for combination and conspiracy to restrain trade in violation of the Wilson Act, 15 U.S.C. § 8, and for combination and conspiracy to monopolize and restrain trade in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  (SAC ¶¶ 151-161.)

Plaintiff's claim under the Wilson Act is dismissed on the same grounds as her Sherman Act claims.  See Hunt v. Mobil Oil Corp., 550 F.2d 68, 75 n.8 (2d Cir. 1977) ("In so far as the substantive antitrust provisions of the Wilson Tariff Act are concerned, they follow the same pattern as the Sherman Act.") (citing United States v. Cooper Corp., 312 U.S. 600, 608 (1941).)

Plaintiff's claim under the Donnelly Act is also dismissed.  The Donnelly Act "was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act."  Gatt Commc'n, Inc. v. PMC Assoc., L.L.C., No. 10 Civ. 8, 2011 WL 1044898, at *4 (S.D.N.Y. Mar. 10, 2011) (Batts, J.) (citations omitted); see also Great Atl. & Pac. Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340,

---

[20] Defendant also argues that Plaintiff's Section 1 Sherman Act claims related to the ALROSA and Botswana agreements are barred by the Act of State doctrine, which "precludes the courts in this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  Banco National de Cuba v. Sabbatino, 376 U.S. 398, 400 (1964); O.N.E. Shipping LTD v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 453-54 (2d Cir. 1987) (affirming dismissal of antitrust claims on Act of State grounds).  Defendant further argues that Plaintiff's Sherman Act Section 1 claims must be dismissed because Plaintiff has failed to allege a plausible relevant market and has failed to show how Defendant restrained competition.  The Court need not address Defendant's Act of State argument, or any of its additional arguments, because it has dismissed Plaintiff's Sherman Act Section 1 claims for other reasons.

352 (E.D.N.Y. 1998) ("The Donnelly Act is patterned after the Sherman Anti-Trust Act . . . and is generally construed in light of federal precedent.").

**V.**   <u>**Conclusion**</u>

For the reasons stated herein, Defendant's motion to dismiss Plaintiff's SAC is GRANTED.

When a court dismisses a complaint, a "court should freely given leave [to amend]when justice so requires." Fed. R. Civ. P. 15(a)(2). Yet, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." <u>Richardson v. Dept. of Corrections of N.Y.S.</u>, No. 10 cv. 6137, 2011 WL 4091491, at *5 (S.D.N.Y Sept. 13, 2011) (Scheindlin, J.) (citations omitted). Here, because Plaintiff's claims have been dismissed, <u>inter alia</u>, on statute of limitations grounds, the Court finds that any amended complaint would be futile.

However, in the event that the <u>Sullivan</u> settlement is vacated, Plaintiff is granted leave to replead (1) any claims surrounding Defendant's advertising and marketing activity that are timely as measured from the SAC (accounting for the fact that Plaintiff's advertising and marketing claims in the SAC do not relate back to the OC), and (2) any claims related to Defendant's 2005 agreement with the Government of Botswana. In addition, in its February 24, 2010 opinion, the Court dismissed Plaintiff's action against defendant Diamdel N.V. "without prejudice to refile if the <u>Sullivan</u> class action settlement is not finalized."[21] <u>Tese-Milner II</u>, at 5 n.1.

---

[21] The Court noted however, "that Plaintiff [could] assert against Diamdel N.V. only claims that accrued on or after the date on which the Amended Complaint was filed." <u>Tese-Milner II</u>, at 5 n.1.

The Clerk of Court is directed to close the docket in this matter.

The parties shall inform the Court within ninety days whether the Sullivan settlement agreement has been vacated.

SO ORDERED.

Dated: New York, New York
       September 29, 2011

Kimba M. Wood
United States District Judge